Joseph G. Pia (9945)
Mark H. Richards (9018)
Derek Anderson (9736)
STUCKI STEELE PIA & ANDERSON
299 South Main Street, Suite 2200
Salt Lake City, Utah 84111
Telephone:  (801) 961-1300
Facsimile: (801) 961-1311

*Attorneys for Plaintiff*

---

## UNITED STATES DISTRICT COURT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| XSTAR FINANCIAL, LLC, a Wyoming limited liability company, <br><br>         Plaintiff, <br><br> vs. <br><br> MONEY & MORE, INC, a Nevada corporation; EVOLUTION DEVELOPMENTS, LLC, a Wyoming limited liability company; GALE ROBINSON, an individual; LARRY BOSH, an individual; SHAWN BENSON, an individual; MIKE SMITH, an individual; and JOHN DOES 1 through 100, <br><br>         Defendants. | **COMPLAINT (Jury Trial Requested)** <br><br> Civil No. 2:08 cv 00951 <br><br> Judge Campbell |

Plaintiff, Xstar Financial, LLC (referred to hereinafter as "Plaintiff," "Xstar," "Investor"

or "Investors), by and through its legal counsel, Stucki Steele Pia & Anderson, and on behalf of

itself and all others similarly situated, brings this Complaint and avers, upon personal knowledge

as to itself and its own acts and upon information and belief as to all other matters based upon the investigation made by and through counsel, as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Xstar Financial, LLC, is a Wyoming limited liability company, authorized to do business in both the States of Wyoming and Utah, with its principal place of business at 3263 North 1250 West, Pleasant View, Utah.

2.      Defendant Money & More, Inc. ("M&M"), is a Nevada corporation, which, upon information and belief, is authorized to do business in both the States of Nevada and California, with its principal place in Riverside County, State of California.

3.      Upon information and belief, Defendant Evolution Developments, LLC ("Evolution"), is a Wyoming limited liability company, which, upon information and belief, is authorized to do business in both the States of Wyoming and Utah, with its principal place of business in Utah County, State of Utah.   During all relevant times hereto, Evolution, upon information and belief, acted as the manager and/or an agent for the investment arm of M&M.

4.      Defendant Gale Robinson ("Robinson") is an individual, who, upon information and belief, resides in Riverside County, State of California, and at all relevant times hereto was the President of M&M.

5.      Defendant Larry Bosh ("Bosh") is an individual who, upon information and belief, resides in Juab County, State of Utah, and during the relevant time period was an owner/member and Manager of Evolution.

6.      Defendant Shawn Benson ("Benson") is an individual who, upon information and

belief, resides in Washington County, State of Utah, and during the relevant time period was an owner/member and Manager of Evolution.

7.     Defendant Michael J. Smith ("Smith") is an individual, who, upon information and belief, is currently incarcerated at the Englewood Federal Correctional Institute located in Littleton, Colorado, where since being convicted on or about March 6, 2008 he is serving a 36-month prison sentence for federal tax and fraud crimes.  Prior to his conviction, Smith was, upon information and belief, a resident of Juab County, State of Utah, and an owner/member and Manager of Evolution.

8.     Defendants John Doe 1 through 100 are officers, directors, agents, or representatives of M&M and/or Evolution, or other persons or entities who are or may be liable for the acts set forth herein.

9.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 5(a), 5(c), 15 and 22 of the Securities Act, [15 U.S.C. §§ 77e(a), 77e(c), 77o and 77v]; Sections 10(b), 20(a) and 27 of the Exchange Act, [15 U.S. §§ 78j(b), 78t(a) and 78aa], Exchange Act Rule 10b-5, [17 C.F.R. § 240.10b-5]; and the federal RICO laws and regulations [18 U.S.C. § 1964; 28 U.S.C. §1331; and 28 U.S.C. §1367].

10.     Venue is appropriate in this Court pursuant to 15 U.S.C. § 77v, 18 U.S.C. § 1965 and 28 U.S.C. §1391(b).  The defendants have purposefully availed themselves of the rights and privileges of the State of Utah and a substantial part of the events or omissions giving rise to the claims set forth herein occurred in Utah.

## GENERAL ALLEGATIONS

*Overview of Defendants' Business Operations and Investment Raising Activities*

11.     M&M is engaged in the business of deferred deposit loan transactions (i.e. the making of short-term payday loans and advances) and, upon information and belief, holds the requisite Check Casher's Permit issued by the State of California.

12.     M&M, which, upon information and belief, began operating in approximately 2001, presently conducts its loan business out of four separate offices located in or nearby Hemet, California.

13.     Upon information and belief, Robinson was the founder of M&M and since its inception has served as its President.  During the relevant time period, Robinson has held herself out as being responsible for managing M&M's business affairs and its day-to-day operations.

14.     Evolution was, upon information and belief, organized in early June 2007 for the purpose of acting as the sole manager of the then-newly created investment arm of M&M's business and to also act as M&M's agent for the raising of new investment capital needed to fund M&M's desired expansion of its business operations.  Evolution acquired these exclusive appointments from M&M under the terms of a management agreement (the "Management Agreement"), which, upon information and belief, Evolution (or Bosh) and M&M executed in or about late May or early June 2007.  Upon acquiring these appointments, Evolution  subsequently acted as the manager and/or agent for the investment arm of M&M's business on a continual basis until at least early October 2008.  As the manager and/or an agent of M&M's investment arm, Evolution assisted M&M in raising all, or virtually all, sums of investor capital paid to M&M during the relevant time period of June 2007 through at least October 2008.

15.     Acting under the scope of its agency with M&M, Evolution (through the individual efforts of Bosh, Benson and Smith), assisted M&M in raising at least $59 million of investment capital from numerous separate investors (the "Investors"), including Plaintiff. Defendants raised all such investment funds through the offering of investment contract securities in the form of oral contracts as well as certain written contracts, titled Factor Agreements (each an "Investor Agreement" and collectively, the "Investor Agreements"), which were separately entered into by and between M&M and each Investor, and which each contain identical, or virtually identical, terms and provisions, excluding the Investor's investment amount (which differs in each Agreement), as those appearing in all other Investor Agreements.

16.     Evolution, Bosh, Benson and Smith acted under the purview, knowledge, and direction of M&M and its principals, officers, managers, agents, and employees, and M&M and Robinson received both direct and indirect benefits from the actions of the other Defendants.

17.     Upon information and belief, no registration statement has ever been filed in connection with the offer or sale of any Investor Agreement by Defendants to an Investor, and no exemption from registration applies.

18.     Moreover, upon information and belief, at the times each Investor executed its respective Investor Agreement (and thereby these investment contract securities were offered and sold to each Investor), including Plaintiff, none of the Defendants was registered as a securities agent or broker with any relevant state or federal securities regulator.

19.     In addition, prior to entering into each Investor Agreement and/or accepting investment funds from the Investors, Defendants made no inquiry into the investment experience

5

of any Investor nor made any effort to otherwise ascertain whether an Investor was an Unaccredited or not.  Upon information and belief, many of the Investors who invested monies in M&M were, and, to date, remain Unaccredited Investors.

20.     In order to induce the Investors, including Plaintiff, to invest money into M&M under the Investor Agreements, Defendants made numerous misrepresentations about M&M's financial status, including, among other things, the projected revenue from current and future loans, the anticipated loan default rate, and the monthly Fee Payment obligation then-owed by M&M to its other Investors.

21.     Additionally, pursuant to the terms of the Investor Agreements and the representations made by Defendants, Defendants made misrepresentations to each Investor relative to promises for a return on each Investor's investment as well as the principal.

22.     Defendants guaranteed extraordinary annual returns in the form of monthly "Fee" payments (i.e. interest payments) of 10% monthly (or 120% annually) (the "Fee Payments") on the principal amount of investment funds each Investor provided to M&M.

23.     Defendants' promise to make the monthly Fee Payments in the agreed-upon amounts to each Investor was a blatant misrepresentation because beginning in or about mid-October 2008, Investors did not receive their scheduled monthly Fee Payments from M&M.

24.     Further, Defendants, upon information and belief, had no reasonable basis to believe, based on their knowledge of M&M's financial performance and revenues generated during prior months, that M&M would generate a sufficient amount of revenues from its business operations for M&M to fulfill the Fee Payment obligation owed to each of its Investors

under the Investor Agreements.

25.    Defendants further misrepresented to the Investors, including Plaintiff, that, according to the terms of the Investor Agreements and representations repeatedly made by Defendants, all investment funds provided by the Investors to M&M pursuant to the Investor Agreements would be used by M&M for the sole and exclusive purpose of funding payday loans to its customers.

26.    Defendants knew, however, at the times they made such promises to the Investors that, contrary to Defendants' representations and promises, the investment funds provided by the Investors were being used by M&M for purposes other than the funding of payday loans to customers. First, Defendants failed to disclose to the Investors, including Plaintiff, prior to the times the Investors entered into their respective Investor Agreements with M&M, the existence of the Management Agreement earlier executed between Bosh and/or Evolution, on the one hand, and M&M, on the other hand. Pursuant to the terms of the Management Agreement, which were only recently disclosed for the first time to the Investors, M&M, upon information and belief, agreed to pay Evolution (and/or Bosh) a sales commission equal to 10% of the aggregate amount of investment capital raised by Evolution (and/or through the efforts of Bosh), acting on behalf of and under the scope of its/his agency for M&M, from the combined group of Investors, plus an ongoing monthly management fee of 1.66% per month of such aggregate investment amount.   M&M, upon information and belief, then used a portion of the investment funds provided by each Investor to pay the commissions and fees M&M owed to Evolution (and/or Bosh) under the Management Agreement.

27.    Second, M&M used a significant portion of the principal amount of the investment funds provided by each Investor to make payment of the monthly Fee Payments M&M owed to its group of Investors.  Indeed, upon information and belief, beginning in January 2008, at the latest, the amount of revenue generated each month from M&M's customer loans combined with the remaining principal amount of all investment funds provided by Investors to M&M prior to that time was insufficient to cover the aggregate amount of the monthly Fee Payment obligations owed by M&M to the Investors.

28.    Accordingly, beginning in January 2008, at the latest, Defendants investment program operated as a Ponzi scheme, *i.e.* a scheme whereby M&M made payment of the monthly Fee Payments owed to the Investors (under their respective Investor Agreements) from the investment monies contributed by other Investors to M&M (and/or from the principal amount of an Investor's own investment monies provided to M&M) and not through the revenue generated by M&M through its making of payday loans.

29.    Over the course of the entire scheme, Defendants used only a fraction of the funds raised from Investors to fund payday loans.

30.    While many of the Investors received their promised monthly Fee Payments from M&M for a period of time under Defendants' fraudulent scheme using the investment funds of other Investors and not revenues generated by customer loans, eventually, beginning in approximately mid-October 2008, shortly after Defendants had solicited and received a large amount of additional investment funds from several new and existing Investors, M&M ceased making any and all scheduled monthly Fee Payments owed to its Investors under the Investor

Agreements.

31.     Defendants have recently admitted that M&M's business model at present cannot

nor at any time could support the return on investment Defendants promised to the Investors and

that M&M therefore has no ability whatsoever to fulfill the obligations it owes to the Investors

under the Investor Agreements.

32.     Defendants have refused to comply with several requests from Investors asking

for a return of the principal amount of their investments.  Defendants have also represented to the

Investors that, at most, the Investors may be repaid the principal amount of their investment in

M&M but are unwilling or unable to state when such refunds may be made.

***Defendants Offer and Sale of Securities to Plaintiff Xstar***

33.     Xstar's introduction to M&M occurred on or about January 15, 2008, when Bosh,

initiated contact with Xstar for the purpose of presenting to it an investment opportunity with

M&M.

34.     Bosh, who introduced his company, Evolution, to Xstar as having been appointed

by M&M as the manager of the investment arm of M&M's business, represented to Xstar that he

was seeking to raise investment capital on behalf of M&M, which M&M would then use for the

sole and exclusive purpose of funding payday loans to customers of M&M.

35.     During or shortly after this initial contact, Xstar was also introduced to Benson

and Smith, individuals who, according to Bosh's representations, were also owners/Managers of

Evolution and who, together with Bosh, served as the management team for M&M's investment

segment.  However, at no time during Xstar's numerous communications with Bosh and/or any

9

other Defendant in connection with Xstar's contemplated investment in M&M did any Defendant disclose to Xstar any information relating to the criminal charges against Smith for fraud which, given that Smith's conviction on these charges occurred on or about March 6, 2008, were undoubtedly known to Defendants and pending at the time Defendants presented to Xstar M&M's investment program in late January 2008.

36. Following a brief period of negotiations between Xstar, on the one hand, and Evolution, acting on behalf of M&M on the other hand, Evolution (through Bosh) repeatedly represented to Xstar that M&M's business operations were extremely profitable and lucrative. Defendants also provided certain financial records of M&M to Xstar which according to Defendants' representations, contained information that supported these representations.

37. Defendants' repeated representations regarding the purported profitability of M&M's operations were false at the time they were made to Xstar in or about January through February 2008. In fact, upon information and belief and as previously noted above, at the time that Xstar was negotiating its investment in M&M, M&M was not generating sufficient monthly revenue from its loan business to meet its then-existing obligations to make Fee Payments to Investors who, at that time, had already invested capital with M&M.

38. Evolution (through Bosh) also repeatedly represented to Xstar that neither Evolution nor any other member of the management team for M&M's investment arm (including, among others, Bosh, Benson or Smith) would receive any management fee, commission, or similar compensation from the investment funds provided by Xstar to M&M in connection with any investment of capital made by Xstar in M&M's business.

10

39.     Based on the representations made by Defendants and the financial records of M&M Defendants provided to Xstar, which contained information consistent with those representations, Xstar ultimately determined to make an investment in M&M and, on or about February 20, 2008, Xstar entered into an Investor Agreement with M&M (the "Xstar Agreement").

40.     Pursuant to the terms of the Xstar Agreement, Xstar agreed to invest an initial principal amount (the "Initial Investment Amount") with M&M on or before the next day, February 21, 2008.

41.     Paragraph 2 of the Xstar Agreement provide that the investment funds of Xstar provided to M&M under the Xstar Agreement "***shall be used to acquire payday loan accounts-receivables only and not for the general operation of [M&M's] business***."   (Emphasis added). Upon information and belief, all other Investor Agreements contain language identical or virtually identical to that of Paragraph 2 of the Xstar Agreement.

42.     Paragraph 3 of the Xstar Agreement provides that M&M agreed to pay Xstar, on a monthly basis, the Fee Payment equal to "10% per month (30% per Quarter)" as a percentage of the investment funds provided by Xstar to M&M, in exchange for Xstar's payment of such funds to M&M under the Xstar Agreement.  The language used to describe the Fee Payments and the interest rate thereof set forth in Paragraph 3 of the Xstar Agreement is also, upon information and belief, identical or substantially similar to the language and interest rate appearing in all other Investor Agreements.

43.     On or about February 21, 2008, the day after Xstar and M&M executed the Xstar

Agreement, Xstar provided to M&M, pursuant to the terms of the Xstar Agreement, the Initial Investment Amount of capital via wire transfer.

44.     Following Xstar's payment of the Initial Investment Amount, Xstar and Evolution (again through the scope of its agency with M&M), negotiated the payment by Xstar of additional investment capital to M&M, all of which Evolution (and M&M) acknowledged and agreed would be made subject to and in accordance with the terms and conditions of the Xstar Agreement, including, among other things, M&M's agreement to pay the monthly Fee Payment based on a percentage of the aggregate investment funds paid to M&M by Xstar.

45.     Ultimately, Xstar invested additional funds with M&M (in addition to the Initial Investment Amount (the "Total Investment Amount") via a series of separate wire transfers made on or about the following dates: June 25, 2008; July 10, 2008; and July 31, 2008.

46.     As a result of Xstar providing to M&M the Total Investment Amount (upon Xstar's final payment of additional investment capital to M&M on July 31, 2008) the monthly Fee Payment owed by M&M to Xstar pursuant to the Xstar Agreement totaled 10% of the total investment.

47.     Prior to entering into the Xstar Agreement or otherwise investing in M&M through its payment of the Initial Investment Amount, Xstar was not asked by Defendants to provide to them any financial or investment experience information.

48.     The Xstar Agreement and the other Investor Agreements constitute investment contracts, and therefore, qualify as a security under Section 2(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act

of 1934 (the "Exchange Act"), 15 U.S.C. § 78(a)(10).

49.     Upon information and belief, no registration statement was filed or subsequently has been filed or is in effect with the Securities and Exchange Commission (the "SEC") in connection with the Xstar's execution of the Xstar Agreement, the investment contract security offered and sold by Defendants to Xstar.

50.     The Xstar Agreement does not disclose any of the risks associated with investing in M&M nor contains any financial information about any of Defendants.  Indeed, prior to Xstar's signing of the Xstar Agreement, neither Bosh, Robinson, Evolution, M&M nor any other Defendant provided to Xstar any prospectus, offering memorandum, mandated disclosures or any other information relating to Xstar's investment in M&M under under the Xstar Agreement, besides the certain financial records of M&M referenced above, which, upon information and belief, contained false information with respect to the profitability of M&M's operations.  To date, Xstar has never been provided copies of any such information from Defendants.

51.     Shortly after Xstar had completed payment of the Total Investment Amount, Defendants, in or about early August 2008, announced to the Investors of M&M (including Xstar) that Defendants had begun taking steps which they claimed were necessary to bring M&M (and its investment raising activities in particular) into compliance with certain SEC requirements.  Thereafter, through a series of additional written communications to the Investors, Defendants represented that they were in the process of preparing, among other things, a Private Placement Memorandum (the "PPM"), which Defendants stated would be provided to each Investor along with a subscription agreement for execution by that Investor.

52.     In connection with Defendants preparation of the PPM, Defendants also circulated to the Investors a document titled "Preliminary Investor Suitability Questionnaire" (the "Investor Questionnaire"), which Defendants requested be completed and returned by each Investor.  Defendants represented that a completed Investor Questionnaire was required from each Investor in order to determine which of M&M's Investors were "Accredited Investors" and which were "Unaccredited Investors, as those terms are defined by the SEC and the securities laws.  According to Defendants, the accreditation status of each Investor was needed because no more than 35 of M&M's Investors could be "Unaccredited Investors" if Defendants were to bring M&M into compliance with the SEC's requirements.

53.     Defendants also announced in connection with their requests to obtain the completed Investor Questionnaires that if it was determined that M&M had more than 35 Unaccredited Investors, then certain of those Unaccredited Investors, may have their investment funds refunded and their investment with M&M terminate as a result.

54.     While Defendants continued to circulate additional written communications to the Investors relating to the PPM from time to time during an approximately 45 day period, ultimately, Defendants failed to circulate a completed draft of the PPM to the Investors or otherwise take any further concrete action designed to address or respond to the SEC compliance issues, which according to Defendants M&M currently faced.

55.     Indeed, despite repeatedly acknowledging that Defendants had failed to comply with the SEC's requirements in conducting their investment raising activities with the Investors and that Defendants needed to bring M&M into compliance with those requirements,

14

Defendants, upon information and belief, continued to raise additional investment capital for M&M from new or existing Investors without making any changes to the methods and procedures they employed.

56.     On or about October 1, 2008, Defendants circulated an email to the Investors, including Xstar, wherein Defendants announced that effective October 6, 2008 (the "Investment Deadline"), Defendants would no longer accept any additional investment capital in M&M from either new or existing Investors.  Besides stating M&M's desire to proceed in the future as a "self-funded company," Defendants provided no explanation to the Investors for the sudden and dramatic change of policy or the reasoning behind the decision to make such a change within only days of its announcement.  Following the announcement, during subsequent private communications with many of the Investors, Defendants encouraged the Investors to invest additional monies in M&M before the Investment Deadline.  Despite representing that no additional investment monies would be accepted after the Investment Deadline (so that M&M could thereby promptly make the switch to operate as a "self-funded company"), Defendants accepted investment monies from numerous different new and existing Investors several days after the Investment Deadline.

57.     Defendants' representation to the Investors that the decision to discontinue the acceptance of additional investment funds following the Investment Deadline was based on M&M's desire to operate as a self-funded company, is belied by the fact that, upon information and belief, at the time Defendants made this announcement M&M's debt (both from its operations and Investors) was so substantial that Defendants could not have reasonably believed

that M&M could begin operating as a self-funded company within the time period contemplated by Defendants.

58.     Based on Defendants' sudden and arbitrary decision to establish the Investment Deadline, and their acceptance of large amounts of investment funds after the Deadline, Defendants' purpose for announcing the Investment Deadline was, upon information and belief, to quickly acquire a large influx of investment capital from Investors by persuading them, under false pretenses, that there existed only a short and final window of opportunity to make an additional investment in M&M and that if the Investors failed to hastily act prior to the Investment Deadline, this window of opportunity would be forever closed.

59.     Upon information and belief, M&M has failed to make payment of a single Fee Payment owed to any of the Investors who provided additional investment funds to M&M since October 1, 2008, which Fee Payments, pursuant to the terms of the Investor Agreements, M&M was required to begin paying 30 days after the date of investment.

60.     While Xstar received some payment from M&M until mid-October 2008, M&M failed to make payments thereafter.

61.

62.     On or about November 26, 2008, during an investors meeting held at M&M's offices in Hemet, California, Xstar learned for the first time, along with most, if not all, other Investors of the existence of the Management Agreement and M&M's promise thereunder to pay Evolution and/or Bosh a sales commission ("Sales Commission") equal to 10% of the total investment capital raised by Bosh (and Evolution) on behalf of M&M plus an ongoing monthly

management fee of 1.66% per month of such total investment amount (the "Management Fee").

63.     Consequently, under the terms of the Management Agreement, M&M, upon information and belief, paid Evolution/Bosh (i) an amount equal to  (10% of of the Total Investment Amount paid by Xstar, as a Sales Commission for the investment capital which Bosh acquired from Xstar on behalf of M&M as a result of his contacts and negotiations with Xstar, plus (ii) an amount equal to approximately 1.66% of $500,000.00 per month since Xstar paid the Total Investment Amount to M&M , as a monthly Management Fee under the Management Agreement.

64.     However, neither M&M, Evolution, their respective agents or principals, (including Robinson, Bosh, Smith, or Benson), were properly registered with the State of California, the State of Utah, the SEC, or any other regulatory body to solicit or manage clients' funds at the times M&M paid the Sales Commissions and Management Fee in connection with the raising of investment capital by Evolution/Bosh on behalf of M&M.  As a result of the payment of such Sales Commission and Management Fee to Bosh/Evolution, upon information and belief, M&M paid an unregistered selling agent(s) a commission from the money they raised from Xstar.

65.     As alleged above, according to the express terms of the Xstar Agreement, all investment funds provided by Xstar to M&M pursuant to the Xstar Agreement were to be used for the sole and exclusive purpose of funding payday loans by M&M to its customers.  The Xstar Agreement contains no exception for the payment of any Sales Commission or Management Fee to Bosh (and/ or Evolution) out of the investment funds provided to M&M by Xstar.

66.     Xstar has made a written request to M&M asking for the return of the Total
Investment Amount, the combined principal amount of investment funds which Xstar has paid to
M&M under the Xstar Agreement.   To date, M&M has provided no response whatsoever to
Xstar's request.   Upon information and belief, M&M has likewise ignored and/or rejected
several similar requests by other Investors.

***Control Person Liability of Individual Defendants***

67.     Robinson, at all relevant times hereto, was the President of M&M and is therefore
a control person as defined in the Securities Act [15 U.S.C. § 77o], the Exchange Act, Section
20(a) [15 U.S.C. § 78t], and in Utah Code Ann. § 61-1-22(4).

68.     Bosh, at all relevant times hereto, was a Manager of Evolution and is therefore a
control person as defined in the Securities Act [15 U.S.C. § 77o], the Exchange Act, Section
20(a) [15 U.S.C. § 78t], and in Utah Code Ann. § 61-1-22(4).

69.     Upon information and belief, Robinson had knowledge of the misrepresentations
and omissions alleged herein, and participated and/or aided in the offering and sales of the
investment contract securities to Plaintiff and the other Investors.

70.     As the President of M&M, Robinson directed and controlled, directly or
indirectly, the management and policies of M&M, including those of its investment arm, and the
actions of Evolution (and/or Bosh, Benson and Smith) who were raising money for M&M
through the offerings described herein.

71.     Upon information and belief, Bosh had knowledge of the misrepresentations and
omissions alleged herein, and participated and/or aided in the offering and sales of the

investment contract securities to Plaintiff and the other Investors.

72.     Benson, at all relevant times hereto, was a Manager of Evolution and is therefore a control person as defined in the Securities Act [15 U.S.C. § 77o], the Exchange Act, Section 20(a) [15 U.S.C. § 78t], and in Utah Code Ann. § 61-1-22(4).

73.     Upon information and belief, Benson had knowledge of the misrepresentations and omissions alleged herein, and participated and/or aided in the offering and sales of the investment contract securities to Plaintiff and the other Investors.

74.     Smith, at all relevant times hereto up until his conviction and subsequent incarceration on or about March 6, 2008, was a Manager of Evolution and is therefore a control person as defined in the Securities Act [15 U.S.C. § 77o], the Exchange Act, Section 20(a) [15 U.S.C. § 78t], and in Utah Code Ann. § 61-1-22(4).

75.     Upon information and belief, Smith had knowledge of the misrepresentations and omissions alleged herein, and participated and/or aided in the offering and sales of the investment contract securities to Plaintiff and the other Investors.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach of Express and Oral/Implied Contracts—Against M&M)**

76.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

77.     According to the terms of the express, oral, and implied agreements set forth in the general allectaions, Defendants were obligated to use Investors' money in a prescribed

manner, make payments to Investors as set forth herein, and act in other required ways.

78.    The Investors have performed all of the obligations it owed to Defendants pursuant to the terms of the parties' agreements.

79.    Defendants failed to make Fee Payments in the required amounts in breach of the parties' agreements.

80.    Defendants failed to use Investors' money in accordance with the parties' agreement.

81.    M&M's failure to timely perform its obligations under the parties' agreements as set forth in the General Allegations constitutes a material breach thereof.

82.    As a direct and proximate result of Defendants' breaches of the parties' agreements, Investors have been damaged in an amount to be proven at trial.

<u>**SECOND CAUSE OF ACTION**</u>

**Violations of Sections 5(a) and 5(c) of the Securities Act
(Sale of Unregistered Securities—Against All Defendants)**

83.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

84.    No registration statement was filed or in effect with the SEC pursuant to the Securities Act and no exemption from registration exists with respect to the securities and transactions described herein.

85.    Since, upon information and belief, at least June 2007 through the present, Defendants, directly and indirectly, have been: (a) making use of the means or instruments of

transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise; (b) carrying securities or causing such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and/or (c) making use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, as described herein, without a registration statement having been filed or being in effect with the SEC as to such securities.

86.     By reason of the foregoing, Defendants, directly and indirectly, have violated, and unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## THIRD CAUSE OF ACTION

### Violations of Section 17(a)(1) of the Securities Act
### (Antifraud violations—Against all Defendants)

87.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

88.     From at least June 2007 through the present, Defendants, in connection with the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce or by the use of the mails, directly and indirectly, have employed and are employing devices, schemes and artifices to defraud.

89.     Defendants knew or were reckless in not knowing of the activities described

above.

90.     By reason of the activities herein described, the Defendants have violated and are violating Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)(1)].

## FOURTH CAUSE OF ACTION

### Violations of Section 17(a)(2) and 17(a)(3) of the Securities Act
### (Antifraud violations—Against all Defendants)

91.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

92.     From at least June 2007 through the present, Defendants, in connection with the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce or by the use of the mails, directly and indirectly, have obtained and are obtaining money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and have engaged and are engaging in transactions, practices or courses of business which have operated and will operate as a fraud and deceit upon Investors.

93.     By reason of the activities herein described, the Defendants have violated and are violating Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)(2) and §77q(a)(3)].

## FIFTH CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Antifraud violations—Against all Defendants)

22

94.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

95.     From at least June 2007 through the present, Defendants, in connection with the offer and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, have employed and are employing devices, schemes and artifices to defraud; have made and are making untrue statements of material fact and have and are omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged and are engaging in acts, practices and courses of business which operated as a fraud and deceit upon Investors.

96.     Defendants knew or were reckless in not knowing of the activities described above.

97.     By reason of the activities herein described, the Defendants have violated and are violating Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

## SIXTH CAUSE OF ACTION

**Violations, and Aiding and Abetting Violations, of Section 15(c)(1) Of The Exchange Act, 15 U.S.C. §78o(c)(1), And Rule 10b-3, 17 C.F.R. §240.10b-3 (Antifraud violations by Brokers—Against Evolution, Bosh, Benson, and Smith)**

98.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

99.     Evolutions, including its Managers, Bosh, Benson and Smith (collectively, the "Broker Defendants"), engaged and are engaging in the business of effecting transactions in

securities for the accounts of others, and therefore were and are brokers within the meaning of Section 3(a)(4) of the Exchange Act, 15 U.S.C. §78c(a)(4).

100.    The Broker Defendants, while acting as brokers, directly or indirectly, by use of the mails or the means or instrumentalities of interstate commerce, has effected and is effecting transactions in, and has induced and attempted to induce and are attempting to induce the purchase or sale of, securities by means of manipulative, deceptive, or other fraudulent devices or contrivances, including: (a) acts, practices, and courses of business that operated or would have operated as a fraud or deceit upon any person, including persons to whom the Broker Defendants offered and/or sold securities; and (b) making untrue statements of material fact and omissions to state a material fact necessary, in order to make the statements made, in light of the circumstances under which they were made, not misleading with knowledge or reasonable grounds to believe that such statements are untrue or misleading.

101.    As part of and in furtherance of this violative conduct, Broker Defendants offered and/or sold securities by making the material misrepresentations and omissions set forth herein.

102.    Broker Defendants knew, were reckless in not knowing, or had reasonable grounds to believe that said representations or omissions were false or misleading.

103.    By reason of the foregoing, Broker Defendants violated, and, unless restrained and enjoined, will again violate Section 15(c)(1) of the Exchange Act, 15 U.S.C. §78o(c)(1), and Rule 10b-3, 17 C.F.R. §240.10b-3.

104.    By reason of the foregoing, Robinson aided and abetted, and, unless restrained and enjoined, will again aid and abet, Broker Defendants' violations of Section 15(c)(1) of the

Exchange Act, 15 U.S.C. §78o(c)(1), and Rule 10b-3, 17 C.F.R. §240.10b-3.

## SEVENTH CAUSE OF ACTION

**Violations of Section 15(a) of the Exchange Act, 15 U.S.C. §78o(a)**
**(Registration violations by Brokers—Against Broker Defendants)**

105.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

106.     Each of Broker Defendants, when he/it was neither registered with the SEC as a broker nor a properly licensed associated person of a registered broker-dealer, made use of the mails or means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of securities.

107.     During the time of the transactions and events alleged in this Complaint, Broker Defendants were neither registered with the SEC as a broker nor properly licensed to sell securities as an associated person of any registered broker-dealer.

108.     By reason of the foregoing, Broker Defendants violated and, unless restrained and enjoined, will again violate Section 15(a)(1) of the Exchange Act, 15 U.S.C. §78o(a)(1).

## EIGHTH  CAUSE OF ACTION

**Violations, and Aiding and Abetting Violations, of Section 15(b) of the Exchange Act and**
**Rule 15b7-1 thereunder, 15 U.S.C. § 78o(b) and 17 C.F.R. § 240.15b7-1**
**(Use of Unregistered Salespersons –Against Broker Defendants)**

109.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

110.     As a result of the conduct set forth above, Broker Defendants willfully violated

Section 15(b) of the Exchange Act and Rule 15b7-1 promulgated thereunder, 15 U.S.C. § 78o(b) and 17 C.F.R. § 240.15b7-1.

111.     Defendants Robinson aided and abetted Broker Defendants' violations of Section 15(b) of the Exchange Act and Rule 15b7-1 promulgated thereunder, 15 U.S.C. § 78o(b) and 17 C.F.R. § 240.15b7-1.

## NINTH CAUSE OF ACTION

**Violations, and Aiding and Abetting Violations, of Section 15(b) of the Exchange Act and Rules 15b1-1 and 15b3-1 thereunder, 15 U.S.C. § 78o(b) and 17 C.F.R. §§ 240.15b1-1, 240.15b3-1**
**(Undisclosed Control Persons –Against Broker Defendants)**

112.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

113.     Broker Defendants failed to disclose to the SEC, as required, that Smith exercised control, directly or indirectly, over Broker Defendants' management and policies, through agreement or otherwise, and that Smith had been convicted on felony tax fraud charges.

114.      As a result, Broker Defendants violated Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), and Rules 15b1-1 and 15b3-1 promulgated thereunder, and 17 C.F.R. §§ 240.15b1-1, 240.15b3-1.

## TENTH CAUSE OF ACTION

**(Violation of State Securities Law – Against all Defendants)**

115.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

116.     Investor Agreements Defendants sold to Plaintiff and the other Investors constitute investment contract "securities" within the meaning of Section 61-1-13(24)(a) of the Utah Uniform Securities Act, Utah Code Ann. § 61-1-1, et seq.

117.     At all relevant times herein, each of the Defendants was a "person" within the meaning of Utah Code Ann. § 61-1-13(19).

118.    Neither the Xstar Agreement nor any other Investor Agreement was registered pursuant to Utah Code Ann. § 61-1-1 *et. seq*, and such Agreements were not exempted nor were they a federal covered security for which a notice was filed pursuant to Utah Code Ann. § 61-1-15.5.

119.    In connection with inducing Plaintiff and each of the other Investors to provide investment funds to M&M, acting individually and in concert, directly and indirectly, Defendants engaged and participated in and/or aided and abetted a continuous course of conduct and conspiracy to misrepresent and to conceal adverse material facts, as specified herein. Defendants used means and instrumentalities of interstate and intrastate commerce or the mails (a) to employ a device, scheme or artifice to defraud the individual Investors, or (b) to obtain their money or property by means of untrue statements of material fact (or by omitting to state material facts necessary in order to avoid misleading the investors), or (c) to engage in transactions, practices or courses of business operating as a fraud or deceit upon the investors, in violation of Utah Code Ann. §§ 61-1-1 and 61-1-2.

120.    Defendants are liable as direct participants in and/or as aiders and abettors of the wrongs complained of herein.  Defendants were able to (and did) control, directly or indirectly, the content of the public statements and other statements disseminated by M&M, within the meaning of Utah Code Annotated § 61-1-22(4)(a).

121.    In particular, Defendants made the material misrepresentations and/or omissions set forth in the foregoing paragraphs of this Complaint.

122.    By failing to inform Plaintiff or any of the other Investors of material facts,

Defendants omitted to state material facts necessary in order to avoid misleading Plaintiff and the other Investors. The material misrepresentations and omissions described herein were intentionally or recklessly made.

123. In reliance upon the above material misrepresentations, and lulled by the above material misrepresentations or omissions, the Investors, including Plaintiff executed their respective Investor Agreements and thereby invested in M&M.

124. Bosh, Robinson, Benson and Smith committed and knowingly aided and abetted the violations of Utah's securities laws as set forth in this claim for relief. Moreover, each were "controlling persons" within the meaning of the applicable securities laws. Among other things, Bosh, Robinson, Benson and Smith aided and abetted Evolution and M&M and others in the sale of the Investor Agreements to the Investors. Due to their management positions these Defendants directed the management and policies of Evolution, M&M and others.

125. At all relevant times, each of the Defendants controlled Evolution and M&M, and are, therefore, jointly and severally liable to Plaintiff.

126. Defendants have violated Sections 61-1-1 and 61-1-22 of the Utah Uniform Securities Act, and Plaintiff is entitled to recover damages from the Defendants in an amount to be determined at trial, together with interest from the date of payment, plus costs and reasonable attorneys' fees.

127. Additionally, pursuant to Section 61-1-22(2), Utah Code Ann., Defendants should be required to pay to Plaintiff three times the consideration paid by Plaintiff pursuant to the Xstar Agreement as investment funds in M&M, together with interest, costs, and attorneys' fees.

## ELEVENTH CAUSE OF ACTION

### (Civil Violation of 18 U.S.C. § 1961, et seq. – Against all Defendants)

128.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

129.    At all times herein, each Defendant was a "person" as defined by 18 U.S.C. § 1961(3).

130.    Each Defendant was an enterprise engaged in interstate or foreign commerce, or the activities of which affected interstate or foreign commerce, as defined by U.S.C. § 1962(b).

131.    Pursuant to 18 U.S.C. § 1962(b), Defendants engaged in a pattern of racketeering activity, including the sale of fraudulent securities, acts of mail fraud and acts of wire fraud as described above.  Defendants operated and sold investments in M&M; conducted the fraudulent schemes in which they directed M&M and other individuals and entities to engage; and concealed their fraudulent activities, thereby permitting the Defendants to continue to operate and wrongfully profit from M&M.

132.    At all times herein, each of the Defendants engaged in an "enterprise" within the meaning of 18 U.S.C.  §§ 1961(4), 1962(c).

133.    This enterprise came into being with the creation of M&M's investment arm and the appointment of Evolution (and/or Bosh) as the manager and or agent thereof continued thereafter as each of the Defendants participated in the scheme to fraudulently solicit investments in M&M, which constituted fraudulent sales of securities.

134.    Throughout the course of the events described in this Complaint, Defendants

conducted, controlled, or participated in the enterprise affairs, including playing a part in directing those affairs, as corporate officers, leading formulators of the fraudulent schemes, and key executors of those schemes on behalf of the enterprise, by engaging in a series of illegal acts, defined as "racketeering activity" by 18 U.S.C. § 1961(1), including the fraudulent sale of securities, mail fraud, and wire fraud.

135.    These acts were all related to one another in that they advanced the objects of the conspiracies described herein, in which Defendants played major roles.

136.    Defendants engaged in the sale of fraudulent securities and engaged in schemes to defraud investors and to deprive Plaintiff of assets and funds.

137.    Each of these schemes was furthered through the use of United States Mail or of the interstate wires.  Each such transaction constitutes mail fraud under 18 U.S.C. § 1341 or of wire fraud under 18 U.S.C. § 1343 and is, therefore, a separate racketeering act.

138.    At all times herein, there existed a racketeering enterprise within the meaning of 18 U.S.C. §§ 1962 (b) and 1962(c) engaged in interstate or foreign commerce whose activities affected interstate or foreign commerce.

139.    The acts alleged above constituted primary violations of 18 U.S.C. § 1962 (b) and/or (c).

140.    Defendants agreed to participate in the racketeering affairs of the enterprise when they agreed to the activities described in this Complaint.  In so agreeing, Defendants also agreed to commit two or more predicate acts, and Defendants committed multiple acts of securities, mail and wire fraud.

141.    Plaintiff suffered injury to its person or property as a proximate result of the primary violation in an amount to be proven at trial.  Defendants are also liable to Plaintiff for damages in the amount of three times the actual damages so proven.

### TWELFTH CAUSE OF ACTION

**(Civil Violation of U.C.A. 76-10-1601, et.seq. – Against all Defendants)**

142.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

143.    At all times herein, each of the Defendants was a "person" as defined by Utah Code Ann. § 76-10-1602(3).

144.    At all times herein, each of the Defendants engaged in an "enterprise" within the meaning of Utah Code Ann. § 76-10-1602(1).

145.    This enterprise came into being with the creation of M&M's investment arm and the appointment of Evolution (and/or Bosh) as the manager and or agent thereof and continued thereafter as each of the Defendants participated in the scheme to fraudulently solicit investments in M&M.

146.    Pursuant to Utah Code Ann. § 76-10-1603, Defendants engaged in a "pattern of unlawful activity" within the meaning of Utah Code Ann. § 76-10-1602(2), including the unlawful sale of fraudulent securities, acts of mail fraud, and acts of wire fraud as described above: Defendants operated M&M, conducted the fraudulent schemes in which they directed M&M and other entities to engage, and concealed their fraudulent activities, thereby permitting

Defendants to continue to operate and wrongfully profit from M&M and other entities.

147.    Throughout the course of the events described in this Complaint, Defendants conducted, controlled, or participated in the enterprise affairs, including playing a part in directing those affairs, as corporate officers, leading formulators of the fraudulent schemes, and key executors of those schemes on behalf of the enterprise, by engaging in a series of illegal acts, including the fraudulent sale of securities, mail fraud, and wire fraud.

148.    These acts were all related to one another in that they advanced the objects of the fraudulent activities described herein, in which Defendants played major roles.  In this manner, each of the Defendants engaged in an unlawful conspiracy, in violation of Utah Code Ann. § 6-10-1603(4).

149.    Plaintiff suffered injury to its person or property as a proximate result of the primary violation in an amount to be proven at trial.  Defendants are also liable to the Plaintiff for damages in the amount of two times the actual damages so proven, in addition to the costs of suit, including reasonable attorneys' fees.

## THIRTEENTH CAUSE OF ACTION

### (Civil Conspiracy – Against all Defendants)

150.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

151.    Defendants knowingly joined and agreed to the terms of the conspiracies described in this Complaint.

152.    Defendants combined with each other to make the misrepresentations and omissions described in this Complaint.

153.    Each of the misrepresentations and omissions described herein and the transactions which led to them were overt acts undertaken in furtherance of these conspiracies.

154.    As a direct result, Plaintiff has been damaged in an amount to be proven at trial.

155.    Based on Defendants' intentional and malicious conduct, Plaintiff also is entitled to recover punitive damages from Defendants.

## FOURTEENTH CAUSE OF ACTION

### (Common Law Fraud/ Negligent Misrepresentation – Against all Defendants)

156.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

157.    Defendants, individually or collectively, participated in or made each of the misrepresentations and omissions described in the foregoing sections of this Complaint.

158.    Each of the omissions described above are related to a material matter and the Defendants had a duty to speak to Plaintiff with regard to each of these misrepresentations and/or omissions for at least the following reasons:

a.    The disclosure of these omissions was necessary in order to prevent the affirmative representations made with respect to the investment from being misleading.

b.    The subject matter of the omissions was facts basic to the solicitation, marketing, and procuring of the investments themselves.

c.      Defendants made misleading partial representations with respect to the same subject matter as the omissions referenced herein.

d.      Defendants actively and intentionally concealed and omitted facts from Plaintiff.

159.    Each of these misrepresentations and omissions concerned a then existing material fact.  Most, if not all, of the material representations were false.  Defendants knew each of these representations was false.  Each of these misrepresentations and omissions was made for the purpose of inducing Plaintiff to rely on the misrepresentation and/or omission.

160.    In the alternative, Defendants should have known that the representations made to Plaintiff were false, and Defendants were negligent in acquiring or communicating information to Plaintiff.  Defendants also had a pecuniary interest in all of the affairs of M&M, and had superior knowledge of the subject matter of the misrepresentations and omissions made to Plaintiff.

161.    Plaintiff was ignorant of the falsity of each of these misrepresentations and omissions, and they reasonably relied on these misrepresentations and omissions.

162.    As a direct, proximate, and foreseeable result of Plaintiff's reasonable reliance on these misrepresentations and omissions, Plaintiff was damaged in an amount to be determined at trial.

163.    As a result of the fraud, negligent misrepresentations, and omissions made by the Defendants, Plaintiff has been damaged in an amount to be determined at trial.

164.    Based on Defendants' malicious, wanton, and intentional behavior, Plaintiff also

is entitled to recover punitive damages from Defendants.

## FIFTEENTH CAUSE OF ACTION

### (Conversion – Against all Defendants)

165.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

166.    Defendants diverted Plaintiff's funds as set forth above.

167.    Plaintiff has demanded return of the diverted funds and hereby again demands return of those funds.

168.    Defendants have refused to return the diverted funds.

169.    By reason of the foregoing, Defendants, with the intent to wrongfully appropriate and assume ownership of the diverted funds, have intentionally assumed and exercised the right of ownership over the diverted funds to the exclusion of the Plaintiff's rights of ownership.

170.    Such taking and continued exercise of the right of ownership over the diverted funds was and is wrongful, intentional, and malicious.

171.    Plaintiff hereby requests that the Court declare that Defendants have converted the diverted funds and award to Plaintiff damages in an amount equal to the diverted funds.

172.    The actions constituting conversion by Defendants have been taken with an intent indicating malice, fraud, and/or wanton disregard for the rights of Plaintiff.  Therefore, Plaintiff is entitled to punitive damages.

## SIXTEENTH CAUSE OF ACTION

**(Unjust Enrichment – Against all Defendants)**

173.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

174.    Defendants received Plaintiff's monies in exchange for the worthless promise of the monthly Fee Payments by M&M.

175.    Acceptance and retention by Defendants of the monies Plaintiff paid under the Xstar Agreement is inequitable insofar as it deprives Plaintiff of funds that rightfully belong to it.

176.    By reason of Defendants' unjust enrichment, Plaintiff has sustained damages in an amount to be determined at trial.

177.    Plaintiff is entitled to recovery of the amounts it paid to Defendants pursuant to the parties' agreements, plus interest.

## SEVENTEENTH CAUSE OF ACTION

**(Declaratory Relief – Against all Defendants)**

178.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

179.    This action has been brought by Investors to among other things determine the claims and rights of each of the investors in M&M and other related entities and/or persons.

180.    This is an appropriate action for this Court to declare the respective rights of the parties and the ownership in and to the assets in possession and control of Defendants.

181.    Plaintiff requests that the Court declare the rights of the Investors with respect to their investments and the assets of Defendants.

## EIGHTEENTH CAUSE OF ACTION

### (Constructive Trust)

182.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

183.    Based on the allegations set forth above in the General Allegations, Defendants improperly received monies from Plaintiff and the other Investors.

184.    Defendants improperly retained the benefits of their wrongful acts.

185.    Defendants were unjustly enriched by their wrongful acts.

186.    The specific monies wrongfully retained by Defendants are traceable to Defendants bank accounts based on each of the wires or numbered checks written by the Investors, including Plaintiff, and deposited by Defendants.

187.    Injustice would result if Defendants were able to keep monies that rightfully belong to Plaintiff and the other Investors.

188.    A constructive trust should be imposed on the accounts of Defendants over any monies or assets received by Defendants.

## NINETEENTH CAUSE OF ACTION

### (Accounting – Against M&M)

189.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint.

190.     As an investor in M&M, who, pursuant to the terms of the Xstar Agreement holds a security interest in M&M's account receivables equal in value to the aggregate amount of investment funds Plaintiff provided to M&M, Plaintiff is entitled to an accounting pursuant to the Xstar Agreement.

191.     Plaintiff seeks and is entitled to a full accounting to determine, without limitation, whether and to what extent (a) the individual Defendants, Robinson, Bosh, Benson and Smith, received commissions, fees, distributions or any other compensation from M&M using a portion of investment monies Plaintiff provided to M&M; and/or (b) Plaintiff's investment monies were used by M&M for any purpose other than to fund payday loans to M&M's customers, contrary to the terms of the Xstar Agreement and Defendants representations that all of Plaintiff's investment funds in M&M would be used solely and exclusively for the funding of payday loans.

### DEMAND FOR JURY TRIAL

The Plaintiff(s), individually and in their representative capacities, respectfully demand a trial by jury of any issue triable of right by a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment in its favor as follows:

A.      Under all causes of action, for judgment against Defendants, jointly and severally, in an amount to be determined at trial.

B.      Judgment in favor of Plaintiff against the Defendants jointly and severally for compensatory damages in an amount to be shown at trial;

C.      Judgment in favor of Plaintiff against each Defendant severally for punitive damages in an amount warranted by the proof at trial;

D.      Entry of an Order granting a preliminary injunction, enjoining Defendants from taking any action which may impair the ability of the Investors to recover their money or assets and mandating, among other things, the appointment of a trustee to work in connection with Defendants to preserve assets and generate revenue for the Investors.

E.      Entry of a permanent injunction, enjoining Defendants from taking any action which may impair the ability of the Investors to recover their money or assets and appointing a trustee to work in connection with Defendants to preserve assets and generate revenue for the Investors.

F.      Entry of an Order imposing a constructive trust over all of the accounts and information of the Defendants relative to the Investors to preserve the assets.

G.      Entry of an Order declaring the respective rights and relationships of the Plaintiffs and the other investors, as an unincorporated association, a partnership, or other business entity, and further setting forth the constituents and interests in such business entity;

H.      Judgment in favor of Plaintiff for costs, including discretionary costs and reasonable attorneys fees; and

40

I.      Such other relief as may be available under law or equity as the Court deems just.


DATED this 10th day of December, 2008.


                              STUCKI STEELE PIA & ANDERSON
                              Joseph G. Pia
                              Mark H. Richards
                              Derek Anderson



                      By:    /s/ Joseph G. Pia
                              ATTORNEYS FOR PLAINTIFF


Plaintiff's Address:
2958 W B St
Torrington, WY 82240